## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLYN ROMAN** | ) | CIVIL ACTION - LAW |
| 3205 Harmor Lane | ) | |
| Bethlehem, PA 18017, | ) | No.: 5:18-cv-01830 |
| | ) | |
| and | ) | AMENDED COMPLAINT |
| | ) | |
| **ANTOINETTE STRUNK**, | ) | JURY TRIAL DEMANDED |
| 828 Tremont Drive | ) | |
| Downingtown, PA 19335 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| **CATHOLIC SENIOR HOUSING &** | ) | |
| **HEALTH CARE SERVICES, INC.**, | ) | |
| d/b/a Holy Family Manor | ) | |
| 1200 Spring Street | ) | |
| Bethlehem, PA 18018, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MICHAEL MELNIC**, Individually and in his | ) | |
| capacity as Chief Executive Officer and Chief | ) | |
| Financial Officer of Catholic Senior Housing & | ) | |
| Health Care Services, Inc. | ) | |
| 1200 Spring Street | ) | |
| Bethlehem, PA 18018, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiffs, Carolyn Roman and Antoinette Strunk, by and through their undersigned

counsel, file this Amended Complaint against Defendants Catholic Senior Housing Health Care

Services, Inc. d/b/a Holy Family Manor and Michael Melnic, jointly and severally, to recover

damages, civil penalties and other monetary relief under Federal Statutes as well as common law

claims.  In support thereof, Plaintiffs aver as follows:

## PARTIES

1.     Plaintiff Carolyn Roman ("Roman"), a Mexican-American, is a citizen of the United

States of America and a resident of the Commonwealth of Pennsylvania where she resides at:

3205 Harmor Lane Bethlehem Northampton County, PA 18017.

2.     Plaintiff Antoinette Strunk ("Strunk"), a Mexican-American, is a citizen of the United

States of America and a resident of the Commonwealth of Pennsylvania where she resides at 828

Tremont Drive, Downingtown, Chester County, PA 19335.

3.     At times material hereto, Roman and Strunk were appointed guardians of their father,

Armando Patino ("Patino"), a Mexican-American, who resided at Holy Family Manor.

4.     Collectively, Roman and Strunk shall be referred to as Plaintiffs.

5.     Defendant Catholic Senior Housing Health Care Services, Inc. d/b/a Holy Family Manor

("HFM") is a Non-Profit (Non-Stock) entity existing under the laws of the Commonwealth of

Pennsylvania and is registered with the Pennsylvania Department of State under the following

entity number: 792754.  Holy Family Manor is registered as a fictitious name of Catholic Senior

Housing Health Care Services, Inc. with the Pennsylvania Department of State under the

following entity number: 3255871.  HFM is actively licensed by the Pennsylvania Department of

Health with regular licensure status and under license number: 082702.  HFM does business at

its principal place of business located at: 1200 Spring Street, Bethlehem, PA 18018.

6.     HFM is part of continuing care retirement community which in addition to independent

living also provides therapy services as well as short term rehabilitation.

7.     In addition to being regulated by the Pennsylvania Department of Health, HFM is an

active participant of both Medicare and Medicaid programs and receives federal funding

therefrom.

8.      HFM is a not-for-profit corporation as described in Section 501(c)(3) of the Internal Revenue Code and, thus, is exempt from federal income taxes on its exempt income under Section 501(a) of the Internal Revenue Code.

9.      HFM follows the Financial Accounting Standards Board accounting standard for accounting for uncertainty in income taxes.

10.     Financial records accessible to the public demonstrated that the cost of benevolent care (charity care) by HFM to its residents amount to approximately $4,350,000 and $4,120,000 in 2015 and 2014, respectively, including costs related to the Medicaid program of approximately $4,330,000 and $4,090,000 in 2015 and 2014, respectively.

11.     Although HFM is technically a nonprofit facility whose income is largely exempt from taxes due to its Federal 501(c)(3) tax status, it is actually run like a for-profit company, paying its executives high salaries, aggressive involvement into new activities and with rolling expansions intentions of its facility.

12.     HFM is a source of profits (assets) and prestige that Catholic Senior Housing Health Care Services, Inc. leverages to attract medical treaters, patients, residents and build its other businesses, including but not limited to: Holy Family Residential Services, Central Office, Holy Family Senior Community, The Antonian, Ltd., Catholic Housing Corporation of Bethlehem, Catholic Housing Corporation of St. Clair, Catholic Housing Corporation of Northern Berks County, Catholic Housing Corporation of Schuylkill County, Catholic Housing Corporation of Lansford, Catholic Housing Corporation of Mount Penn and Catholic Housing Corporation of New Philadelphia.

13.     According to disclosures made to the Pennsylvania Insurance Department on or about

April 29, 2016, Catholic Senior Housing Health Care Services, Inc. reported assets (income)

totaling: $29, 263, 353.00 for fiscal year 2015; and $30,201, 271.00 for fiscal year 2014.

14.     HFM charged residents, like Patino, approximately $350.00 per each day/night (unit)

which equals approximately $10,500.00 per month and $126,000.00 yearly as fees to reside at

their facility.  These resident fees do not account or include additional fees which are assessed to

each resident/patient for additional medical, treatment, therapy or care services which are

rendered to each patient/resident.

15.     In this context, in which HFM placed a high priority on volume and profit rather than

preventing and/or minimizing wrongdoing against Plaintiffs (daughters and guardians of Patino,

a former HFM resident).

16.     HFM affords fair housing and equal opportunity and in one of its written policy

statements indicates "[a]dmission to CSHHCS, Inc. is open to all people regardless of race,

color, religion, national origin, sex, handicap or disability. All faiths welcome."

17.     At all times material hereto, HFM knew, condoned and/or concealed the wrongdoing of

its employees and /or agents as more fully set forth below.

18.     Defendant Michael Melnic ("Melnic") is an adult individual who, at times material

hereto, was serving in his capacity as Chief Executive Officer and Chief Financial Officer of

Catholic Senior Housing Health Care Services, Inc.  On 6/20/17, Melnic became actively

licensed by the State Board of Examiners of Nursing Home Administrators as a Nursing Home

Administrator and registered in the same capacity with the Pennsylvania Department of State,

Bureau of Professional and Occupational Affairs under the following license number:

NH007701.

4

19.     At all times material hereto, Melnic oversaw, exercised control and rendered decisions over the finances, liabilities and operations of HFM.  Melnic was HFM's decisionmaker.

20.     At times material hereto (4/29/16 – 6/19/17), despite his active authoritative and administrative role at HFM, according to public State records, Melnic was not licensed and/or registered as Nursing Home Administrator until 6/20/17.

21.     Melnic acted with animus and malice in retaliating against Plaintiffs who, at times material hereto, discovered and unveiled that their father, while residing at HFM, was being administered unwarranted chemical restraints, controlled substances, narcotics and/or sedatives including but not limited to morphine, oxycodone and clonazepam.

22.     At all times material hereto, Melnic had knowledge but deceptively concealed the wrongdoing which HFM employees and/or agents manifested towards Plaintiffs.

23.     Collectively, HFM and Melnic shall be referred to as Defendants.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this action pursuant to pursuant to 42 U.S.C. §§1981, 1983, 1985, 1986, and 1988 alleging violations of their constitutional rights under the Fourteenth Amendment.

25.     All actions complained of in this complaint occurred within Lehigh County and all Defendants are located within Lehigh County, therefore jurisdiction and venue are proper before this Honorable Court. 28 U.S.C. §§ 1331 and 1334.

## FACTUAL ALLEGATONS

### Introduction

26.     From April 29, 2016 until his death on October 7, 2017, Mr. Patino resided at HFM.

27.     Plaintiffs' parents (Armando and Antonia Patino) had long been aware of HFM and had expressed to both Roman and Strunk that they both wished to become residents of HFM if the

need ever arose.  Before becoming a school teacher, Plaintiff Roman worked at HFM given her family's strong ties with such a Catholic institution.  As such, Plaintiffs knew that their father, a devout Mexican-American Catholic, cherished HFM since it was the only facility with a Catholic chapel which was located in the same neighborhood where Mr. Patino had lived, raised a family and attended church, Saints Simon and Jude Catholic Church in Bethlehem, PA.

28.     As a public school teacher in the Bethlehem Area School District ("BASD") for 37 years, Roman was a mandatory reporter of wrongdoing.  Despite HFM's disparaging characterization that Roman was difficult and confrontational, Roman's reporting actions were in conformity with both her obligations to the Pennsylvania Department of Education as well as BASD protocols and practices.  In short, as a Guardian for her father, Roman knew that she had both a legal and moral obligation to report the various, numerous and egregious misgivings and/or shortcomings and/or wrongdoings that HFM manifested to Mr. Patino on a frequent and regular basis to her knowledge.

29.     During his lifetime, Mr. Patino made it abundantly clear that when life's circumstances would require him to go to a healthcare facility, he desired only one place: HFM, the only Catholic facility near his home. As such, to fulfill his will, his daughters did as dad wished.

30.     While under the treatment and care of Holy Family Manor, Mr. Patino, a 93 year old Alzheimer's victim, was administered chemical restraints, controlled substances, narcotics and sedatives including but not limited to morphine, oxycodone and clonazepam.  This heinous practice of administering chemical restraints, controlled substances, narcotics, sedatives to Alzheimer's victims for convenience or discipline is commonly referred to as "drugging" or "snowing" or "overmedicating" in such healthcare facilities.

31.     Plaintiff Roman first discovered that Mr. Patino had been drugged at HFM on 5/1/16 when he was administered morphine.  Upon said discovery, Roman forbade HFM to administer morphine to her father without her permission.

32.     Despite the foregoing discovery and subsequent instruction, 12 days later, on the evening of 5/13/16, Plaintiff Roman again discovered that her father had been drugged.  In fact, Roman discovered that her father had been drugged with narcotic medications ("narcotics") from 5/9/16 to 5/13/16.  Immediately thereafter, Roman demanded to discuss her father's treatment and care with HFM officials.

33.     Holy Family Manor's deliberate drugging of Mr. Patino was not an isolated incident. Rather, his drugging, which included instances of stacking controlled substances with themselves or with other medications with high risk interaction rates, continued until being detected and foiled by his daughters/guardians, the Plaintiffs herein.  HFM deliberately drugged Mr. Patino for their own convenience and/or to discipline him.  When drugged and overmedicated, HFM did not have to deal with Mr. Patino's various health conditions or his disability since he would either be asleep or too drowsy to perform daily life activities.  HFM's drugging had transformed Mr. Patino into a slobbering mess which resulted in Mr. Patino being: (1) unable to converse, (2) unable to feed himself; and (3) unable to notify HFM of the need to use the bathroom causing him to urinate on himself to such an extent that the urine would permeate and be visible on the outside of his clothing.

34.     On 5/9/16, while Mr. Patino was drugged, one of HFM's physical therapy aids/assistants known as "Katie" and Mack observed him urinating on himself and though his clothes.  Instead of providing professional care to Mr. Patino, Katie publicly made derogatory remarks about having to clean Mr. Patino and change his urinated clothing.

35.    While drugged and overmedicated, HFM's therapists recommended to Medicare to stop improvement therapies due to Mr. Patino's behavior; his drowsiness and inability to perform daily life activities.  Ironically, HFM's therapists based their recommendation to stop improvement therapies on Mr. Patino on a behavior/condition which HFM had created by unlawfully and unnecessarily drugging Mr. Patino.

36.    As a result of the foregoing recommendation: (1) Mr. Patino's improvement therapies were stopped by HFM at HFM; (2) Strunk was compelled to pursue appeals with Medicare on behalf of her father to overturn HFM's unilateral determination to terminate improvement therapies for Mr. Patino; (3) Strunk incurred personal expenses associated with the Medicare appeals process; (4) Roman and Strunk were compelled to take their father to improvement therapies at an off-site third-party healthcare facility; (5) Roman and Strunk incurred personal expenses associated with their dad's improvement therapies which were being conducted at the off-site third-party healthcare facility.

37.    Contrary to HFM's foregoing recommendation, Mr. Patino's health and function positively progressed as a result of the improvement therapies which he was undergoing at the off-site third-party healthcare facility.

38.    Mr. Patino was born in Sulphur Mine, LA and had a storied 33-year career as a steelworker at the Bethlehem Steel facility located in Bethlehem, PA.  Mr. Patino, at all times, had command of the English language.  Despite his all-American life, upon being caught, HFM feebly mitigated their wrongdoing by woefully suggesting that Mr. Patino's misunderstanding of the English language served as justifiable reasoning for his drugs; absolute absurdity.  Adding discrimination to injury, HFM indicated that Mr. Patino would require a Spanish translator for future administration of medication.

39.     HFM's top level staff, including administrators and/or supervisors and/or directors, were well aware and informed of the drugging of Mr. Patino.  On 5/16/16 and 5/17/16, in an effort to mitigate and/or minimize the drugging of Mr. Patino, HFM organized meetings with their staff, Dr. Garolnik (Mr. Patino's in-house physician) and his daughters/guardians, the Plaintiffs herein. Subsequent to said meetings, in a deceptive effort to conceal and/or suppress its wanton behavior, HFM deliberately destroyed the minutes of the foregoing meetings.  Similarly, the relevant public records from the Pennsylvania Department of Health are devoid of Mr. Patino's drugging incidents.

40.     From the date of discovering and unveiling their father's drugging, as more fully set forth below, Defendants have discriminated and/or retaliated against Plaintiffs Carolyn Roman and Antoinette Strunk.

### HFM's Employees and/or Agents

41.     At all times material hereto, Plaintiffs interacted with the following employees and/or agents of HFM:

> a.  Susan Regalis ("Regalis") is an adult individual who, at times material hereto, was serving in her capacity as a Nursing Home Administrator of Holy Family Manor.  Regalis is actively licensed by the State Board of Examiners of Nursing Home Administrators as a Nursing Home Administrator and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: NH007071;
>
> b.  Maryann Reisinger ("Reisinger") is an adult individual who, at times material hereto, was serving in her capacity as Director of Nursing of Holy Family Manor and Rehabilitation Center.  Reisinger is actively licensed by the State Board of Nursing as a Practical Nurse and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: PN051581L;
>
> c.  Sharon Livering ("Livering") is an adult individual who, at times material hereto, was serving in her capacity as the Business Manager of Holy Family Manor and Rehabilitation Center;

d. Barbara Mack ("Mack") is an adult individual who, at times material hereto, was serving in her capacity as Director of Social Services of Holy Family Manor and Rehabilitation Center. Mack is actively licensed by the State Board of Social Workers, Marriage & Family Therapists and Professional Counselors as a Clinical Social Worker and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: CW007337L;

e. Stephanie Muschlitz ("Muschlitz") is an adult individual who, at times material hereto, was serving in her capacity as Director of Clinical Reimbursement and Quality Assurance. Muschlitz is actively licensed by the State Board of Nursing as a Registered Nurse and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: RN505626L;

f. Peter Okungu, RN ("Okungu") is an adult individual who, at times material hereto, was serving in his capacity as a Registered Nurse Director of Social Services of Holy Family Manor and Rehabilitation Center. Okungu is actively licensed by the State Board of Nursing as a Registered Nurse and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: RN619772. At all times material hereto, Okungu administered chemical restraints, controlled substances, narcotics, sedatives and/or other medications to Mr. Patino for convenience and/or discipline; and

g. Boris Goralnik, MD ("Dr. Goralnik") is an adult individual and licensed physician who is actively licensed by the State Board of Medicine as a medical physician and surgeon and registered in the same capacity with the Pennsylvania Department of State, Bureau of Professional and Occupational Affairs under the following license number: MD446780. According to Mr. Patino's admission records from Holy Family Manor, Dr. Goralnik was identified as his attending physician.

42. At all times material hereto, HFM, by and through its employees and/or agents and/or contractors, discriminated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

43. At all times material hereto, Melnic, a white male, intentionally discriminated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

44.     At all times material hereto, Melnic, a white male, intentionally retaliated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

45.     At all times material hereto, HFM, by and through its employees and/or agents and/or contractors, discriminated against Strunk, a Mexican American, a Mexican-American, on the basis of her race and/or color and/or national origin.

46.     At all times material hereto, Melnic, a white male, intentionally discriminated against Strunk, a Mexican-American, on the basis of her race and/or color and/or national origin.

47.     At all times material hereto, Melnic, a white male, intentionally retaliated against Strunk, a Mexican-American, on the basis of her race and/or color and/or national origin.

48.     At all times material hereto, HFM, by and through its employees and/or agents and/or contractors, treated Roman differently than any other Guardian/POA/Responsible Party in a manner which violates 42 U.S.C. §2000d et seq.

49.     At all times material hereto, Melnic intentionally treated Roman differently than any other Guardian/POA/Responsible Party at HFM.

50.     At all times material hereto, HFM, by and through its employees and/or agents and/or contractors treated Strunk differently than any other Guardian/POA/Responsible Party at HFM.

51.     At all times material hereto, Melnic intentionally treated Strunk differently than any other Guardian/POA/Responsible Party in a manner at HFM.

52.     At all times material hereto, HFM violated Mr. Patino's resident rights under 42 CFR § 483.10.

53.     At all times material hereto, Melnic intentionally violated Mr. Patino's resident rights under 42 CFR § 483.10.

54.     At all times material hereto, HFM manifested discriminatory treatment against Mr. Patino by not affording him skilled nursing services relating to physical therapy at HFM.

55.     At all times material hereto, Melnic intentionally manifested discriminatory treatment against Mr. Patino by not affording him skilled nursing services relating to physical therapy at HFM.

56.     At all times material hereto, HFM manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.

57.     At all times material hereto, Melnic intentionally manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.

58.     At all times material hereto, HFM manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.

59.     At all times material hereto, Melnic intentionally manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM

60.     At all times material hereto, HFM manifested discriminatory treatment against Mr. Patino by drugging him which resulted in him being unable and/or incapable of performing or properly functioning when participating in physical therapy services at HFM.

61.     At all times material hereto, Melnic intentionally manifested discriminatory treatment against Mr. Patino by concealing HFM's drugging which resulted in Mr. Patino being unable and/or incapable of performing or properly functioning when participating in physical therapy services at HFM.

62.     At all times material hereto, HFM, by and though its employees and/or agents, conspired to deny Mr. Patino skilled nursing services relating to physical therapy at HFM.

63.     Melnic, by and though Reisinger, conspired to deny Mr. Patino skilled nursing services relating to physical therapy at HFM.

### Discharge from St. Luke's Hospital

64.     On 4/29/16, subsequent to a 4-day hospitalization, Mr. Patino was discharged from St. Luke's Hospital after being treated for acute on chronic diastolic congestive heart failure.  In relevant part, the discharging physician indicated the following as the basis for discharge:

> "This is a 92 year old gentleman with dementia admitted with acute on chronic diastolic CHF and treated with IV Lasix.  He also had mild AKI [Acute Kidney Injury on admission which improved during his stay but Cr [Creatine] was worsened to 1.7 at the time of discharge.  He was euvolemic on discharge but was advised to hold Lasix, Lisnopril and Kcl [Potassium Chloride] until Monday and restart them after checking BMP on 5/2/16.  Also his Seroquel dose was increased to 37.5 mg at bedtime."

65.     Notably, Mr. Patino's discharge summary delineated the following medications: Amlodipine (Norvasc), Atorvastatin (Lipitor), Calcium-Vitamin D (Oscal 500 + D), Finasteride (Proscar), Furosemide (Lasix), Latanoprost (Xalatan), Levothyroxine, Lisinopril (Zestril), Metoprolol Tartrate (Lopressor), Montelukast (Singular), Potassium Chloride (K-Dur, Klor-Con), Quetiapine (Seroquel), Terazosin (Hytrin) and Timolol (Betimol).

66.     Despite a 4-day hospitalization, Mr. Patino's relevant medical records were devoid of any chemical restraints, controlled substances, narcotics, sedatives including but not limited to morphine, oxycodone or clonazepam.

### Admission to HFM

67.     On same day as his discharge from St. Luke's Hospital (4/29/16), Mr. Patino was admitted to HFM for short term care in its McShea Unit ("admission").

68.     Upon his admission, the primary diagnosis made by HFM for Mr. Patino was:

> "acute on chronic diastolic (congestive) heart failure.  Secondary and ancillary diagnoses included: Alzhemier's Disease, Dementia in other diseases classified

with behavioral disturbance, hypersensitive chronic kidney disease with Stage 1 through Stage 4 chronic kidney disease, hypothyroidism, hyperlipidemia, nonrheumatic aortic (valve) stenosis, chronic disease, Stage 3 (Moderate), Enlarged Prostrate without lower urinary tract symptoms, unsteadiness on feet, unspecified urinary incontinence and other symbolic dysfunctions."

69.     Upon his admission, Mr. Patino's attending physician at HFM was Dr. Goralnik.

70.     Immediately preceding admission to HFM, Mr. Patino performed the following daily life activities: (1) walked with the use of a walker; (2) fed himself; (3) read the newspaper daily; (4) took himself and used the bathroom on his own; (5) conversed on a variety of topics; (6) wore boxers as underwear; (7) maintained his dentures and brushed his teeth on his own; (8) combed his own hair; (9) shaved himself with a disposal razor; (10) made his own coffee, toast and other meals; (11) took his own medications; (12) went outside to perform light gardening activities; (13) attended Adult Day Care; (14) participated in activities at Adult Day Care; (15) visited family members for dinner; and (15) consumed regular food which was not mechanically chopped, minced or pureed.

71.     Two days after admission (4/29/16 and 4/30/16), Mr. Patino was sitting up, feeding himself, conversing with others and his family, walking with his walker, joking with the HFM staff and he would even walk, through the use of his walker, to the bathroom and use it on his own.

72.     Subsequent to his admission to HFM's short term care unit (McShea), Roman and Strunk submitted an application on behalf of Mr. Patino to be admitted to HFM's long term care facility which adjoins McShea.

**Drugged at HFM**

73.     From 5/1/16 to 5/13/16 ("drugging period"), Mr. Patino was drugged at HFM by its employees and/or agents.

14

74.     During the foregoing time period, in addition to administering his daily medications, including quetiapine, HFM would also administer morphine and/or oxycodone and/or clonazepam and/or a combination thereof to Mr. Patino.

75.     On 5/1/16, after being administered morphine, Plaintiffs noticed a change with their father's condition; he was sleeping more and was much less energetic.

76.     During the foregoing drugging period, the morphine and/or oxycodone was almost exclusively administered to Mr. Patino late in the night (after 11pm) or very early in the morning (before 5am).  The stacking of the morphine and/or oxycodone and/or clonazepam, included either double stacking of the oxycodone, or, stacking the oxycodone with the clonazepam.

77.     At all times material hereto, HFM, given the nature of their facility, was aware of the increased risk of serious side effects from the interaction (via stacking) of the foregoing medications and narcotics.

78.     Despite their knowledge of the risk of serious side effects, HFM administered the foregoing medications and narcotics for their convenience and/or to discipline Mr. Patino.

79.     During the foregoing drugging period, at no time, did HFM contact Roman or Strunk regarding a modification of the medications from his Hospital Discharge and/or adding chemical restraints, controlled substances, narcotics, sedatives to the list of prescriptions for their father.

**Narcotic Medication Forbidden**

80.     On 5/1/16, Roman (Daughter and Legal Guardian of Patino's person) while visiting her father and after checking his medical prescription intake, she was informed by HFM staff that her father had been given morphine the preceding evening to relieve his "pain" and to help him with his "respiratory function."

81.     Immediately upon being informed, on the same day (5/1/16), Roman confronted Dr.

Goralnik to unequivocally forbid prescribing and/or administering any more narcotics to her

father.  Dr. Goralnik acknowledged Roman's said instruction.

**HFM Stops Improvement Therapy**

82.     On 5/13/16, Mack contacted Roman to inform her that the HFM therapy team had: (1)

decided to discontinue providing her father with improvement therapies due to his behavior;

specifically, Mr. Patino's drowsiness and inability to perform daily life activities; and (2) that her

father would be better served in a facility with a dedicated dementia unit.

83.     On 5/13/16, Roman and Strunk met with Melnic for approximately two (2) hours to

discuss HFM's decision to discontinue their father's improvement therapies. Melnic advised

Roman and Strunk to appeal, through the Office of Medicare Hearings and Appeal, HFM's

decision to discontinue providing Mr. Patino with improvement therapies

84.     On 5/14/16, Roman went to HFM to visit her father.  Roman found her father in an

overly drowsy state and vomiting.  At that moment, given her instruction to Garolnik on 5/1/16

(forbidding the use of narcotics), Roman and/or Strunk were unaware that HFM had continued

drugging their father.  By 3pm on this day, Roman was provided the list of

medicines/prescriptions which had been administered which unequivocally revealed that her

father had been drugged.

85.     As more fully averred below, HFM's decision to stop Mr. Patino's improvement therapy

violated his resident rights under 42 CFR § 483.10.

86.     As more fully averred below, by deciding to stop improvement therapy, HFM manifested

discriminatory treatment towards Mr. Patino by denying him skilled services relating to physical

therapy.

**Drugging is Discovered**

87.    On 5/14/16, Roman and Strunk went to HFM during the day to visit her father.  Roman and Strunk find that their father is completely drained and unable to do anything.  A "weekend" physical therapist working at HFM informed Strunk that Mr. Patino was "totally out of it."  The assigned HFM therapist asked Strunk "what is your dad on?"  In finding her father in such an inebriating condition, Strunk immediately notified Roman to reveal her findings.

88.    On the same day (5/14/16), in response to their findings, Roman went to visit her father at HFM at 9:30 evening.  At approximately 11:45 pm, Roman discovered, through HFM's medication nurse, that her father was administered Oxycodone by Nurse Okungu on the preceding evening (5/13/16).  Roman immediately confronted Okungu who indicated that he gave Mr. Patino the Oxycodone because he believed that Mr. Patino expressed experiencing pain in his neck area.

89.    Roman reiterated to Okungu that on 5/1/16 she specifically forbade administration of any narcotics to her father.

90.    Further, in Okungu's presence, Roman confirmed that her father had no neck pain.  Upon hearing the foregoing confirmation, Okungu, despite knowing Mr. Patino's command of the English language, responded to Roman that perhaps Mr. Patino did not understand his questions about pain and that next time he might get a Spanish translator.

91.    By 3:00 on 5/14/16, Roman had discovered that her father had been getting drugged at HFM from 5/3/16 to 5/13/16 with morphine and/or oxycodone and/or clonazepam or combinations thereof.

92.    On 5/15/16, Roman, along with her son (Jordan) and her brother (David Patino), goes to HFM to visit her father.  Upon arrival at approximately at 10:00am, she again finds her father

completely out of it.  Roman immediately demanded to meet with HFM officials to discuss the

drugging of her father.  In response, HFM organized a teleconference which included: (1) HFM's

on-duty social worker (Bridget); (2) HFM's on-duty nursing supervisor (Hartik); (3) one of

HFM's off-duty nursing supervisors; (4) Roman; (5) Roman's son (Jordan); and (6) Roman's

brother (David Patino).  During the teleconference, Roman and Strunk requested that HFM

schedule a meeting to discuss their father's condition.

93.     Mr. Patino's drugging by HFM at HFM violated his resident rights under 42 CFR §

483.10.

94.     Melnic's concealment of Mr. Patino's drugging violated his resident rights under 42 CFR

§ 483.10.

**HFM Meetings About Drugging**

95.     On 5/16/16, HFM held a meeting ("5/16 Meeting") in its boardroom to discuss the

drugging of Mr. Patino.  Those in attendance at the 5/16 meeting included: Melnic, Reisinger,

Mack, Muschlitz, Ursula Davis (HFM), Karen Dobias (HFM) and Roman; Strunk participated in

the meeting via teleconference.

96.     In response to HFM's request, Roman agreed to allow for meeting minutes to be

transcribed at the 5/16 Meeting so long as she would be provided with a copy of the same.

Melnic agreed to provide Roman with a copy of the meeting minutes for the 5/16 Meeting.

97.     At the 5/16 Meeting, which lasted approximately 2 hours, HFM informed Roman and

Strunk that:

    a.  HFM had assigned a "team" of HFM employees and/or agents ("HFM-Patino-
        Team" or "HPT") to overlook and/or mange the treatment and care of Mr.
        Patino;

    b.  on 5/2/16 HPT began discussing having Mr. Patino leave (discharged) from
        HFM;

    c.  on 5/4/16, HPT decided that Mr. Patino would leave (be discharged) from HFM;

    d.  by compelling Mr. Patino to leave (be discharged), HFM was effectively denying his application for residency in their long term care unit;

    e.  HFM, through Muschlitz, opined that Mr. Patino's condition had declined so rapidly (approximately 1 week) because he had experienced the "spiraling downward" effect which happens to elderly individuals with Mr. Patino's health and mental conditions when they moved to a different facility; and

    f.  HFM would arranged a second meeting to discuss Mr. Patino's drugging with Dr. Goralnik.

98.    The foregoing decision, which was conveyed for the first time at the 5/16 Meeting, directly contradicted what Mack had previously conveyed to Roman on 5/9/16 when Mack indicated to Roman that HFM had not made a decision about Mr. Patino staying or leaving from HFM.

99.    On the same evening (5/16/16 at 10:05pm), Roman emailed Reisinger requesting a copy of the meeting minutes from the 5/16 Meeting.  Reisinger never replied to Roman's email request.

100.    On 5/17/16, HFM held a second meeting ("5/17 Meeting") in Mack's office to discuss the drugging of Mr. Patino.  Those in attendance at the 5/17 meeting included: Melnic, Reisinger, Mack, Dr. Goralnik and Roman; Strunk participated in the meeting via teleconference.

101.    Prior to commencement of the 5/17 Meeting, Roman asked Reisinger for a copy of the meeting minutes from the 5/16 Meeting.  Reisinger responded that she would provide Roman with a copy of said meeting minutes subsequent to "Mr. Melnic proofing [the 5/16 Meeting minutes]."

102.    Minutes later, immediately upon Melnic's arrival to the 5/17 Meeting, Roman asked

Reisinger for a copy of the meeting minutes from the 5/16 Meeting.  Reisinger responded that

Melnic was still "proofing" the minutes.

103.    Seconds later, contrary to Reisinger's statement, Melnic when asked whether he had

completed "proofing" the meeting minutes, he responded that the "[5/16 Meeting] minutes had

been purged because the secretary who was taking minutes had left the meeting and that the

meeting had continued with major issues being discussed."

104.    At the 5/17 Meeting, the following decisions were rendered:

      a.    Mr. Patino was not to be given any more narcotics;

      b.    Under no circumstances were medications, of any kind, to be given, or
          discontinued, to Mr. Patino without Roman and/or Strunk's consent; and

      c.    Despite HFM's prior decision to discharge at the 5/16 Meeting, Mr. Patino
          would be moved to HFM's Long Term Care Unit and, essentially by doing so,
          his long-term care application would be deemed accepted by HFM.

105.    Given their father's devout desire to remain at the only Catholic facility near his home,

Roman and Strunk agreed with HFM to have Mr. Patino moved to HFM's Long Term Care Unit.

106.    Melnic and Reisinger conspired to conceal Mr. Patino's drugging at HFM by the

employees and/or agents of HFM.

**Moved to Long Term Unit**

107.    On 5/21/16, Mr. Patino was moved to room 114 of HFM's Long Term Care Unit.

108.    On 5/21/16, an HFM employee informed Plaintiff Roman that Barbara Mack had labeled

Mr. Patino's family as a "difficult family."

**Medicare Appeal**

109.    Subsequent to Mr. Patino being moved to HFM's long term care unit, Strunk began

appealing the decision to discontinue improvement therapies to the Office of Medicare Hearings

and Appeals.  This appeal was assigned to Judge J. Gerald Lewis, U.S. Administrative Law

Judge for the Mid-Atlantic Filed Office (Arlington, VA) of the Office of Medicare Hearings and

Appeals and docketed as: ALJ Appeal No.: 1-4662836774 ("Patino Medicare Appeal" or

"PMA").

110.    To date, despite Mr. Patino's passing, the PMA is still pending with the Office of

Medicare Hearings and Appeals.

111.    The PMA is premised on the denial of skilled nursing facility services for Mr. Patino

during his time at HFM.

112.    Initially, Judge Lewis ordered HFM to perform and physical therapy evaluation of Mr.

Patino by and through HFM's own physical therapy department.

113.    Strunk and Roman believe and aver that their father was not afforded a proper physical

evaluation since HFM had previously drugged their father.  As a result, HFM discriminated their

father by not affording a full and fair physical therapy evaluation of their father.

114.    Strunk and Roman believe and aver that their father that it would have been impossible

for their father to progress effectively at physical therapy at HFM due to the various narcotics he

was given even while undergoing physical therapy sessions at HFM.

115.    On 5/14/16, HFM sedated Mr. Patino so heavily with oxycodone that it was impossible

for him to perform and/or function in his scheduled 1:00pm physical therapy session at HFM.

Mr. Patino oxycodone sedation was so significant on 5/14/16 that Strunk was compelled to feed

him his lunch since the sedation detrimentally impacted Mr. Patino's ability to feed himself.

116.    Strunk and Roman believe and aver their father was not experiencing neck pain, rather,

HFM's decision to overly sedate Mr. Patino was part of the ongoing discriminatory treatment

manifested towards him.  HFM's discriminatory treatment of Mr. Patino, including denial of

their skilled nursing service relating to his physical therapy, is evidenced by the administration of narcotics for pain (contrary to his hospital medical records) coupled with their denial of furthering their physical therapy treatments for Mr. Patino.

117.    As averred in further detail below, given HFM's discriminatory treatment of Mr. Patino relating to affording skilled nursing service for his physical therapy, Strunk and Roman obtained private improvement therapy for their father.

118.    Strunk incurred personal expenses associated with the PMA.

**Long-Term Care Representation**

119.    In addition to the PMA, subsequent to Mr. Patino being moved to HFM's long term care unit, Roman and Strunk retained legal counsel for representation relating to long-term care planning services ("Patino Long-Term Care Representation") for their father.  Roman and Strunk initiated the Patino Long-Term Care Representation in an attempt to ensure that their father would continue to receive treatment and care at HFM during the pendency of qualifying for Medicaid coverage.

120.    Roman and Strunk, acting as Guardians on behalf of their father, engaged Vasilaides & Associates for a flat fee of Ten Thousand Dollars ($10,000.00) to serve as legal counsel ("PLTC Counsel") for the Patino Long-Term Care Representation.  The foregoing flat fee ($10,000.00) was to be paid with their father's monies which was being maintained in escrow.

121.    During his time at HFM's Long Term Care Unit, Roman and Strunk ensured that Mr. Patino was being visited by his children and/or family friends on a daily basis.  Generally, a week's visitation scheduled consisted of:

    a.  Sundays – In the morning, Roman would go to HFM's Catholic Chapel with her father to ensure that he would receive communion.  In the evening, Armand David Patino ("David Patino"), Mr. Patino's son (brother of Plaintiffs) would come to HFM to have dinner with his father;

    b.   Mondays – Roman would go to HFM to have dinner with her father;

    c.   Tuesdays – Roman and Strunk would have a family friend have dinner with their father;

    d.   Wednesdays - David Patino would have dinner with his father;

    e.   Thursdays - Roman and Strunk would have a family friend have dinner with their father;

    f.   Fridays – Strunk would spend the entire day with her father;

    g.   Saturdays – Roman and Strunk would spend the day with their father.

122.    As averred above, Roman and Strunk went out of their way to ensure that their father was, at all times, in the company of his own children or close family friends so he would never feel forgotten or lonely.

**Private Improvement Therapy**

123.    Given HFM's discriminatory treatment of Mr. Patino in providing him skilled nursing services relating to physical therapy, Strunk and Roman contacted their father's primary care physician, Dr. Figares, who ordered 12 weeks of improvement therapy.

124.    From the beginning of October of 2016 through December of 2017, Roman and/or Strunk would transport and attend private improvement therapy ("Private Improvement Therapy" or "PIT") with their father at an off-site healthcare facility, Robbins Rehabilitation ("Robbins"), since HFM had discontinued his in-house improvement therapies which emanated from HFM drugging Mr. Patino an then finding him incapable of performing therapy.

125.    At his initial PIT session, the physical therapist (Todd Robbins, MSPT) diagnosed Mr. Patino with general deconditioning and poor function as a result of his inactivity and felt that Mr. Patino would benefit from continued therapy focused on building basis strength and function.

126.    During this time, Roman and/or Strunk took their father to approximately 27 PIT sessions at the Robbins facilities which was located at 5325 Northgate Drive, Suite 200, Bethlehem, PA 18017 (approximately 5.1 miles away from HFM) and 2690 Kingston Road, Easton, PA 18045 (approximately 14.7 miles away from HFM).

127.    During this time, Roman and/or Strunk incurred personal expenses associated with the PIT sessions, including but not limited to using vacation and/or sick days from work as well as travel expenses associated driving to and from their respective residences to/from HFM and to/from Robbins.

128.    Plaintiff Roman was compelled to convert sick days to FMLA in order to care for their father.  As such, Plaintiff Roman was required to use FMLA status for the care and treatment of her father.

129.    During this time, Roman and/or Strunk incurred personal expenses since they were required to purchase a wheelchair in order to transport their father.  Plaintiffs repeated requests for HFM to provide them with a wheelchair to transport their father to his PIT sessions fell on deaf ears; HFM disregarded requests from Roman and/or Strunk to provide them with a wheelchair for their father.  As a result, Roman and Strunk were to compelled to pay for a wheelchair and thus incurring personal out-of-pocket expenses.

130.    Absent Mr. Patino's drugging at HFM, the PIT at Robbins would not have been necessary.  Mr. Patino's drugging caused his physical inability to participate in improvement therapy at HFM and also caused him, through Strunk, to file the Medicare Appeal.  As a direct and proximate result of the actions and/or actions and/or conduct of HFM and Melnic, Roman and Strunk suffered injury and/or sustained damages in connection to their active participation with their father's PIT at Robbins.

131.   HFM's drugging of Mr. Patino resulted in discriminating against Mr. Patino received the proper skilled nursing services relating to his physical therapy, which as evidenced by the foregoing PIT, would have resulted in his overall improvement.

**HFM's Petition to Remove Plaintiffs as Guardians of their Father**

132.   From the date that Mr. Patino was moved to HFM's Long Term Care Unit, at all times material hereto, HFM was informed and aware of the Patino Medicare Appeal as well as the Patino Long-Term Care Representation.  Further, HFM was well aware that disposition of the Patino Medicare Appeal coupled with determinations made by counsel for the Patino Long-Term Care Representation would decide the source of payments for Mr. Patino's care and treatment at HFM.

133.   Despite this knowledge, on June 7, 2017, HFM filed a "Petition Requesting Review Hearing of an Incapacitated Person and the Appointment of Successor Guardian of the Person and the Estate" ("Petition to Remove") in the Orphans' Court Division ("Orphans Court") of the Court of Common Pleas of Lehigh County where said action was docketed as: 2016-0860.

134.   Amongst other allegations, HFM incredulously averred:

   a.   that none of the proceeds from the sale of their father's home were returned to, or used by Roman and/or Strunk to his benefit, i.e. insinuating that Roman and/or Strunk has misappropriated their father's money;

   b.   that Roman and/or Strunk were confrontational with HFM staff and disruptive of other patients care due to the nature of their complaints and ongoing demands;

   c.   that neither Roman nor Strunk were acting in the best interests of their father as his Guardians ("Guardians");

   d.   that Roman and/or Strunk violated their duties of loyalty and fidelity as their father's respective Guardians;

   e.   that Roman and/or Strunk used their powers as Guardians for personal gain; and

f.  that Roman and Strunk should be removed as their father's Guardians.

135.    The Petition to Remove was verified by Regalis, as NHA (Nursing Home Administrator) for HFM since Melnic, despite acting as Nursing Home Administrator for HFM, was not licensed to do so until 6/20/17.

136.    The Petition to Remove was devoid of allegations or facts relating to the drugging of Mr. Patino.

137.    Despite HFM's insinuating allegation, Roman and Strunk maintained all of the proceeds from the sale of their father's home in an escrow account during the pendency of the Patino Medicare Appeal and the Patino Long-Term Care Representation.

138.    On 8/11/17, a hearing in connection to the Petition to Remove ("8/11 Hearing") was held before Judge Reibman.

139.    Melnic appeared and testified at the 8/11 Hearing.

140.    Melnic testified that meeting minutes of the 5/16 Meeting had been destroyed (purged).

141.    At the 8/11 Hearing, it became apparent that the Petition to Remove was filed by HFM and Melnic with the intent to discriminate and as retaliatory animus for Roman and Strunk discovering and disclosing that their father had been drugged at HFM.  As averred above, HFM and Melnic were well aware that the Patino Medicare Appeal as well as the Patino Long-Term Care Representation were pending at the time of the filing of the Petition to Remove.

142.    Despite their knowledge, HFM and Melnic sought to have Roman and Strunk removed as Guardians for their Father and/or to remove Mr. Patino from HFM.

143.    HFM and Melnic could have pursued civil claims against Mr. Patino and/or Roman and/or Strunk for the financial civil dispute over payments, however, HFM and Melnic

methodically selected to file the Petition to Remove with the Orphans' Court to discriminate against Roman and Strunk.

144.    Despite Muschlitz's foregoing opinion that Mr. Patino's condition had rapidly declined (approximately 1 week) because he had experienced a "spiraling downward" effect which happens to elderly individuals with Mr. Patino's health and mental conditions when moved to a different facility, HFM and Melnic still sought removal of Mr. Patino from HFM.

145.    During the course of the 8/11 Hearing, Roman and Strunk were put in position, with a proverbial gun to their heads, to essentially choose 2 options: (1) take their father out of HFM; or (2) remove themselves as Guardians and give HFM all of the money in their father's escrow account.  Given their father's desire to be in a Catholic facility so he could take communion every Sunday, Roman and Strunk, despite being discriminated, were compelled to select the latter option to ensure that their father would stay at HFM and continue to serve his best interests.

146.    At the conclusion of the 8/11 Hearing, Judge Reibman entered an agreement order in conformity to option 2 above.

147.    After further consideration of the 8/11 Hearing, Roman and Strunk filed a Notice of Appeal with the Superior Court of Pennsylvania.

148.    The issues before the Superior Court became moot upon the death of Mr. Patino. Subsequent to Mr. Patino death, Roman and Strunk provided all monies maintained in their father's escrow account as payment of One Hundred Twenty-Four Thousand Dollars ($124,000.00) to HFM.

149.    In light of the above disbursement, Roman and Strunk were compelled to personally pay PTCP Counsel its flat fee of $10,000.00 since the escrow monies were distributed in their

entirely to HFM.  As a direct and proximate result of HFM's and Melnic's discrimination and retaliatory animus, Roman and Strunk sustained $10,000.00 in out-of-pocket expenses.

**Patino Roommate at HFM's Long-Term Care Unit**

150.    Throughout Mr. Patino's time at HFM's Long-Term Care Unit, he was roommates with an 85-year old white male ("Patino Roommate").  For confidentiality, the specific identity of Patino Roommate is being withheld from herein.  Patino Roommate passed away on 12/31/16.

151.    At all times material hereto, Patino Roommate's guardian was a white female ("Patino Roommate Guardian").

152.    Patino Roommate, like Mr. Patino, had an ongoing financial dispute with HFM regarding payment for his care and treatment.

153.    Upon information and belief, Patino Roommate, like Mr. Patino, applied for Medicate coverage.

154.    Upon information and belief, it took approximately 2 years for Patino Roommate to obtain Medicare coverage which would be used as a means of payment for HFM's services.

155.    Upon information and belief, at no time during the foregoing time period did Patino Roommate make any payments for HFM's services.

156.    At no time during the foregoing time period did HFM or Melnic file or take any legal action against Patino Roommate for payment for his care and treatment.

157.    At no time during the foregoing time period did HFM or Melnic file or take any legal action against Patino Roommate Guardian for payment of Patino Roommate's care and treatment.

158.     At no time during the foregoing time period did HFM or Melnic file or take any legal action against Patino Roommate Guardian to appoint a Power-of-Attorney in her place.

**HFM Patient – Room 123D**

159.    At all times material hereto, HFM has provided long-term care and treatment to an 86-year old white female who resides in Room 123D of HFM's Long-Term Care Unit ("Patient 123"). For confidentiality, the specific identity of Patient 123 is being withheld from herein. On 3/5/18, Patient 123 celebrated her 87th birthday.

160.    Patient 123's Power-of-Attorney/Guardian/Responsible Party is a white female ("Patient 123 Guardian").

161.    Patient 123 owes HFM over One Hundred Thousand Dollars ($100,000.00) for her care and treatment at HFM.

162.    At no time did HFM or Melnic advise Patient 123 that she would have to leave and/or be discharged from HFM because of failure to pay for care and treatment.

163.    At no time did HFM or Melnic advise Patient 123 Guardian that Patient 123 would have to leave and/or be discharged from HFM because of failure to pay for care and treatment.

164.    At no time did HFM or Melnic file or take any legal action against Patient 123 for payment for his care and treatment.

165.    At no time did HFM or Melnic file or take any legal action against Patient 123 Guardian for payment of Patient 123's care and treatment.

166.     At no time did HFM or Melnic file or take any legal action against Patient 123 Guardian to remove her from acting capacity for Patient 123 or seek to appoint a successor in her place.

**COUNT ONE (I)**
**DISCRIMINATION BASED ON RACE**
**AND COLOR IN VIOLATION OF**
**42 U.S.C. §2000d ET SEQ.**
**(Plaintiffs v. Defendants)**

167.    Plaintiffs incorporate by reference and re-allege all prior paragraphs of the Complaint as if fully set forth herein.

168.    Title VI, 42 U.S.C, §2000d et seq., prohibits discrimination on the basis of race, color and national origin in programs and activities receiving federal financial assistance. Enabling regulations, 28 C.F.R. §42.104, in relevant part, provide:

> §42.104 Discrimination prohibited.
>
> (a)     *General.* No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this subpart applies.
>
> (b)     *Specific discriminator actions prohibited.* (1) A recipient to which this subpart applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin:
>
> > (i)     Deny an individual any disposition, service, financial aid, or benefit provided under the program;
> >
> > (ii)     Provide any disposition, service financial aid, or benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;
> >
> > (iii)     Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program;
> >
> > (iv)     Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program;
> >
> > (v)     Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership, or other requirement or condition which individuals must meet in order to be provided any disposition, service, financial aid, function or benefit provided under the program.

*See* 28 C.F.R. §42.104

169.    HFM has received and continues to receive Federal funding and/or assistance.

170.     As more fully averred above, Defendants discriminated against Mr. Patino by not affording him skilled nursing services relating to physical therapy at HFM.  As a result of this discriminatory treatment, Mr. Patino suffered harm and Plaintiffs sustained damages.

171.     As more fully averred above, Defendants discriminated against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  As a result of this discriminatory treatment, Mr. Patino suffered harm and Plaintiffs sustained damages.

172.     As more fully averred above, Defendants discriminated against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  As a result of this discriminatory treatment, Mr. Patino suffered harm and Plaintiffs sustained damages.

173.     As more fully averred above, Defendants discriminated against Mr. Patino by drugging him which resulted in him being unable and/or incapable of performing or properly functioning when participating in physical therapy services at HFM.

174.     At all times material hereto, in light of the foregoing, HFM violated Mr. Patino's resident rights under 42 CFR § 483.10.

175.     At all times material hereto, in light of the foregoing, Melnic intentionally violated Mr. Patino's resident rights under 42 CFR § 483.10

176.     Defendants discriminated against the complaining Plaintiffs on the basis of their race and/or color and/or national origin.

177.     Defendants retaliated against the complaining Plaintiffs on the basis of their race and/or color and/or national origin.

178.     Defendants never filed nor took any legal action against Patino Roommate, an 85-year old white male, for payment of the care and treatment which HFM provided to him.

179.    Defendants never filed nor took any legal action against Patino Roommate Guardian, a white female, for payment of the care and treatment which HFM provided to Patino Roommate.

180.    Defendants never filed or took any legal action against Patino Roommate Guardian to appoint a new guardian in her place.

181.    Defendants never advised Patient 123, an 86-year old white female, that she would have to leave and/or be discharged from HFM because of failure to pay for care and treatment provided to her.

182.    Defendants never advised Patient 123 Guardian, a white female, that Patient 123 would have to leave and/or be discharged from HFM because of failure to pay for care and treatment provided to her.

183.    Defendants never filed nor took any legal action against Patient 123 for payment for care and treatment provided to her.

184.    Defendants never filed nor took any legal action against Patient 123 Guardian for payment of care and treatment services provided to Patient 123.

185.    Defendants never filed nor took any legal action against Patient 123 Guardian to remove her in her acting capacity for Patient 123 or seek to appoint a successor in her place.

186.    Defendants took legal action against Roman and Strunk, who unlike the foregoing Guardians, are Mexican-American.

187.    HFM, by and through its employees and/or agents and/or contractors, discriminated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

188.    Melnic, a white male, intentionally discriminated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

189.  Melnic, a white male, intentionally retaliated against Roman, a Mexican-American, on the basis of her race and/or color and/or national origin.

190.  HFM, by and through its employees and/or agents and/or contractors, discriminated against Strunk, a Mexican American, a Mexican-American, on the basis of her race and/or color and/or national origin.

191.  Melnic, a white male, intentionally discriminated against Strunk, a Mexican-American, on the basis of her race and/or color and/or national origin.

192.  Melnic, a white male, intentionally retaliated against Strunk, a Mexican-American, on the basis of her race and/or color and/or national origin.

193.  HFM, by and through its employees and/or agents and/or contractors, treated Roman differently than any other Guardian/POA/Responsible Party in a manner which violates 42 U.S.C. §2000d et seq.

194.  Melnic intentionally treated Roman differently than any other Guardian/POA/Responsible Party in a manner which violates 42 U.S.C. §2000d et seq.

195.  HFM, by and through its employees and/or agents and/or contractors, treated Strunk differently than any other Guardian/POA/Responsible Party in a manner which violates 42 U.S.C. §2000d et seq.

196.  Melnic intentionally treated Strunk differently than any other Guardian/POA/Responsible Party in a manner which violates 42 U.S.C. §2000d et seq.

197.  As a direct and proximate result of Defendants' discriminatory treatment, intentional conduct and/or wrongdoing in violation of 42 U.S.C. §2000d et seq., Plaintiffs have suffered injuries and sustained damages as were averred more fully above.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants, jointly and severally, in an amount in excess of the $150,000.00 arbitration limit for the United States District Court for the Eastern District of Pennsylvania, together with punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as well as all such further relief as this Honorable Court deems just and proper.

**COUNT TWO (II)**
**DEPRAVATION OF RIGHT OR**
**PRIVILEGE IN VIOLATION OF**
**42 U.S.C. §1985**
**(Plaintiffs v. Defendants)**

198.    Plaintiffs incorporate by reference and re-allege all prior paragraphs of the Complaint as if fully set forth herein.

199.    In relevant part, 42 U.S.C. §1985 (3) Depriving Persons of Rights or Privileges, provides:

> "in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having or exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against one or more of the conspirators."

42 U.S.C. §1985 (3)

200.    Plaintiffs informed HFM and Melnic that the Medicare Appeal was pending for their father and that they retained legal counsel regarding the Patino Long-Term Care Representation. At all times material hereto, HFM and Melnic were aware of the foregoing particulars.

201.    At no time did HFM or Melnic inquire Plaintiffs as to the status of the Medicare Appeal.

202.    At no time did HFM or Melnic inquire Plaintiffs as to the status of the Patino Long-Term Care Representation.

203.    Defendants racially discriminated against Plaintiffs on the basis of their race and/or color and/or national origin by filing the Petition to Remove against Roman and Strunk.

204.    Defendants racially retaliated against Plaintiffs on the basis of their race and/or color and/or national origin by filing the Petition to Remove against Roman and Strunk

205.    By racially singling out Roman and Strunk, Defendants falsely and publicly personified Plaintiffs as using their authority/powers as Guardians to the detriment of their own father, a fact which they knew was not true.

206.    By racially singling out Roman and Strunk, Defendants falsely and publicly personified Plaintiffs as using their authority/powers as Guardians as a means of personal gains, a fact which they knew was not true.

207.    Plaintiffs are informed and believe that there was substantial cooperation between Melnic and HFM to intentionally deprive Roman and Strunk of their constitutional rights and privileges through racial discrimination and retaliatory animus.

208.    The deliberate and intentional actions were due to their racially charged agenda to forcibly remove Roman and Strunk as Guardians because Plaintiffs had discovered and disclosed that HFM had drugged their father.

209.    Defendants espoused and promulgated discriminatory policies and practices and conspired to deprive Roman and Strunk of their civil rights as alleged herein.

210.    As more fully averred above, Melnic along with HFM staff, notably Reisinger, conspired to conceal Mr. Patino's drugging, by and through withholding the meeting minutes as well as their ultimate destruction.

211.    As more fully averred above, Melnic along with HFM staff, notably Mack, conspired to

deny Mr. Patino skilled nursing services at HFM so they could remove him from HFM to further

conceal his drugging.

212.    As a direct and proximate result of Defendants' intentional conduct and wrongdoing in

violation of 42 U.S.C. §1985, Plaintiffs have suffered injuries and sustained damages as were

averred more fully above.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment

against Defendants, jointly and severally, in an amount in excess of the $150,000.00 arbitration

limit for the United States District Court for the Eastern District of Pennsylvania, together with

punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as

well as all such further relief as this Honorable Court deems just and proper.

**COUNT THREE (III)**
**RACIAL & COLOR DISCRIMINATION**
**UNDER COLOR OF STATE LAW IN**
**VIOLATION OF 42 U.S.C. §1983**
**(Plaintiffs v. Defendants)**

213.    Plaintiffs incorporate by reference and re-allege all prior paragraphs of the Complaint as

if fully set forth herein.

214.    As averred and described more fully above, Roman and Strunk, Mexican-Americans,

were compelled by HFM to remove themselves as Guardians for their beloved father.  Neither

HFM nor Melnic treated similarly-situated white (Caucasian) Guardians in such a manner.

215.    At all times material hereto, the discrimination manifested by Melnic towards Roman and

Strunk, based on their race and/or color and/or national origin, was intentional.  In contrast to

Roman and Strunk, Patino Roommate and Patient 123 and their affiliated were all white

(Caucasian).

216.     As averred and described more fully above, Defendants racially discriminated against the complaining Plaintiffs on the basis of their race and/or color and/or national origin.

217.     As averred and described more fully above, Defendants racially retaliated against the complaining Plaintiffs on the basis of their race and/or color and/or national origin.

218.     As averred and described more fully above, Defendants deprived Roman and Strunk of their federal constitutional and/or statutory rights by failing and refusing to provide them with equal treatment as the other white (Caucasian) Guardians and committed or omitted discriminatory acts as alleged herein.

219.     As averred and described more fully above, Defendants racially discriminated and/or retaliated by insinuating that Roman and Strunk misappropriated their father's money in their respective capacities as Guardians.

220.     As averred and described more fully above, Defendants racially discriminated and/or retaliated by insinuating that Roman and Strunk were not serving their father's best interests in their respective capacities as Guardians.

221.     As averred and described more fully above, at all times material hereto, Defendants knew that Strunk had filed the Medicare Appeal and that Plaintiffs engaged legal counsel to facilitate the Patino Long-Term Care Representation.  Despite this knowledge, Melnic intentionally discriminated and retaliated against Plaintiffs because they discovered and disclosed that their father had been drugged by HFM employees and/or agents while under the care and treatment of HFM.

222.     In furtherance of his intentional conduct and wrongdoing, Melnic facilitated the support, cooperation and services of the HFM employees and/or agents to disparage, discriminate, and retaliate against Plaintiffs.  In doing so, the intentional acts, wrongdoing, discrimination,

disparagement and retaliation against Plaintiffs were carried out conjunctively by Melnic and HFM, by and through its employees and/or agents.

223.    HFM and Melnic acted under color of state law when they deprived Plaintiffs of their federal rights, interests and otherwise discriminated and/or disparaged and/or retaliated against them based upon their race and/or color and/or national origin.

224.    As a direct and proximate result of Defendants' intentional conduct and wrongdoing in violation of 42 U.S.C. §1983, Plaintiffs have suffered injuries and sustained damages as were averred more fully above.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants, jointly and severally, in an amount in excess of the $150,000.00 arbitration limit for the United States District Court for the Eastern District of Pennsylvania, together with punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as well as all such further relief as this Honorable Court deems just and proper.

### COUNT FOUR (IV)
### DENIAL OF EQUAL RIGHTS UNDER
### THE LAW IN VIOLATION OF
### 42 U.S.C. §1981
### (Plaintiffs v. Defendants)

225.    Plaintiffs incorporate by reference and re-allege all prior paragraphs of the Complaint as if fully set forth herein.

226.    42 U.S.C. § 1981 ("Section 1981"), in relevant part, provides:

> "(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

227.    HFM violated Mr. Patino's resident rights under 42 CFR § 483.10.  Mr. Patino and his daughters were Mexican-Americans.

228.    Melnic intentionally violated Mr. Patino's resident rights under 42 CFR § 483.10.  Mr. Patino and his daughters were Mexican-Americans.

229.    HFM manifested discriminatory treatment against Mr. Patino by not affording him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

230.    Melnic intentionally manifested discriminatory treatment against Mr. Patino by not affording him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

231.    HFM manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

232.    Melnic intentionally manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

233.    HFM manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

234.    Melnic intentionally manifested discriminatory treatment against Mr. Patino by denying him skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

235.   HFM manifested discriminatory treatment against Mr. Patino by drugging him which resulted in him being unable and/or incapable of performing or properly functioning when participating in physical therapy services at HFM.  Mr. Patino and his daughters were Mexican-Americans.

236.   Melnic intentionally manifested discriminatory treatment against Mr. Patino by concealing HFM's drugging which resulted in Mr. Patino being unable and/or incapable of performing or properly functioning when participating in physical therapy services at HFM.  Mr. Patino and his daughters were Mexican-Americans.

237.   HFM, by and though its employees and/or agents, conspired to deny Mr. Patino skilled nursing services relating to physical therapy at HFM.  Mr. Patino and his daughters were Mexican-Americans.

238.   Melnic, by and through HFM staff, notably Reisinger and Mack, conspired to conceal Mr. Patino drugging and/or conspired to have Mr. Patino removed from HFM.

239.   The Patinos, as Mexican-Americans are members of a protected class and thus had the clearly established statutory right under this provision of 42 U.S.C. § 1981 to be free from racially motivated accusations and actions taken against them with retaliatory animus.

240.   Melnic and the HFM employees and/or agents who intentionally committed wrongdoing against Roman and Strunk were white (Caucasian) and acted under color of state law and with racially charged motivation in their unlawful discrimination and/or disparagement and/or retaliation against Plaintiffs.

241.   Although Section 1981 provides extensive equal protection rights, 42 U.S.C. § 1983 ("Section 1983") provides the remedy for Section 1981 violations by state actors such as Melnic

and HFM employees and/or agents.  Section 1981 was promulgated to afford remedy in instances where discrimination based upon race is an operative element of the claims.

242.    Melnic discriminated against Roman and Stunk on the basis of their race and/or color and/or national origin.

243.    Melnic deprived Roman and Strunk of rights protected by the Constitution of the United States of America and also intended to deny them rights which are enjoyed by Caucasian citizens of the United States.

244.    Roman and Strunk did in fact suffer harm and sustain damages due to the foregoing violations of their Constitutional rights since Melnic's intent to deprive them of rights enjoyed by white (Caucasian) citizens of the United States.

245.    The supervisors and policy-makers of the Defendants were aware of the denial of equal rights under the law or deliberately overlooked and have developed practices, protocols policies, customs and/or habits of depriving non-Caucasians equal rights under the law, and either ignored or encouraged the Constitutional violations alleged herein.

246.    As a direct and proximate result of Defendants' intentional conduct and wrongdoing in violation of 42 U.S.C. §1981, Plaintiffs have suffered injuries and sustained damages as were averred more fully above.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants, jointly and severally, in an amount in excess of the $150,000.00 arbitration limit for the United States District Court for the Eastern District of Pennsylvania, together with punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as well as all such further relief as this Honorable Court deems just and proper.

## COUNT FIVE (V)
## FOURTEENTH AMENDMENT DENNIAL OF EQUAL PROTECTION

**"CLASS OF ONE"**
**(Plaintiff Roman v. Defendants)**

247.    Plaintiff Roman incorporates by reference and re-alleges all prior paragraphs of the

Complaint as if fully set forth herein.

248.    Plaintiff Roman brings the instant equal protection claim under the theory that she is a

"class of one."

249.    Plaintiff Roman alleges that the Defendants, state actors, intentionally and disparately

treated her compared to others similarly situated and that there is no rational basis for the

difference in treatment by the Defendants.

250.    Plaintiff Roman further avers that as a direct and proximate result of the unequal and

disparate treatment Plaintiff Roman received, she suffered injuries and sustained damages,

including being financially injured.

WHEREFORE, Plaintiff Roman respectfully requests that this Honorable Court enter

judgment against Defendants, jointly and severally, in an amount in excess of the $150,000.00

arbitration limit for the United States District Court for the Eastern District of Pennsylvania,

together with punitive damages, and other relief, including costs of suit, reasonable attorney and

expert fees as well as all such further relief as this Honorable Court deems just and proper.

**COUNT SIX (VI)**
**FOURTEENTH AMENDMENT DENNIAL OF EQUAL PROTECTION**
**"CLASS OF ONE"**
**(Plaintiff Strunk v. Defendants)**

251.    Plaintiff Strunk incorporates by reference and re-alleges all prior paragraphs of the

Complaint as if fully set forth herein.

252.    Plaintiff Strunk brings the instant equal protection claim under the theory that she is a

"class of one."

253.    Plaintiff Strunk alleges that the Defendants, state actors, intentionally and disparately treated her compared to others similarly situated and that there is no rational basis for the difference in treatment by the Defendants.

254.    Plaintiff Strunk further avers that as a direct and proximate result of the unequal and disparate treatment Plaintiff Roman received, she suffered injuries and sustained damages, including being financially injured.

WHEREFORE, Plaintiff Strunk respectfully requests that this Honorable Court enter judgment against Defendants, jointly and severally, in an amount in excess of the $150,000.00 arbitration limit for the United States District Court for the Eastern District of Pennsylvania, together with punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as well as all such further relief as this Honorable Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

KOTSATOS LAW, PLLC

Date: 7/16/18

By:    John E. Kotsatos, Esquire
PA Identification No.: 92807
Kotsatos Law, PLLC
717 Washington St.
Easton, PA 18042
Phone: 484-403-6214
Fax: 610-438-6351
Email: jk@lawjek.com

Counsel for Plaintiffs